## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 22-14389-CIV-MIDDLEBROOKS/MAYNARD

DEBBIE ANN PETE,

     Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

     Defendant.

_____/

### REPORT AND RECOMMENDATION

     Plaintiff, Debbie Ann Pete, brings this action under the Social Security Act seeking judicial review of Defendant's final decision denying her application for disability benefits.  DE 1. Plaintiff timely exhausted her administrative remedies, and Defendant's decision is ripe for judicial review under 42 U.S.C. §§ 405(g), 1383(c)(3).

     After Defendant filed the certified administrative record, DE 12 (cited herein as "R. __"), Plaintiff filed her Motion for Summary Judgment.  DE 18.  Defendant responded with a Motion for Summary Judgment, DE 19, and a Court-ordered Supplemental Brief, DE 22, to which Plaintiff replied, DE 23.  Having carefully considered the parties' briefing and the record, I recommend that Plaintiff's Motion for Summary Judgment, DE 18, be **DENIED**; that Defendant's Motion for Summary Judgment, DE 19, be **GRANTED**; and that Defendant's administrative decision be **AFFIRMED** for the following reasons.

### BACKGROUND

     On October 20, 2020, Plaintiff filed an application for Supplemental Security Income ("SSI") benefits, alleging a disability onset date of October 15, 2019, due to back, knee and feet

pain, migraine headaches, and "heart." R. 10, 15, 260.[1]  Plaintiff was 47 years old on her alleged disability onset date with a high school education, and past relevant work as a hairdresser (DOT 332.271-018). R. 20.

 Plaintiff's claim was denied initially and on reconsideration. R. 85-95, 96-100.  On January 7, 2022, at Plaintiff's request, Administrative Law Judge ("ALJ") Gonzalo Vallecillo held a hearing at which Plaintiff, Plaintiff's counsel, and a vocational expert ("VE") appeared. R. 28-52. The ALJ heard testimony from Plaintiff and VE Lorin Lovely. R. 33-52.  On February 14, 2022, the ALJ issued a decision finding Plaintiff not disabled since her application date of October 20, 2020, though the date of the ALJ's decision. R. 10-22.  On October 3, 2022, the Appeals Council denied Plaintiff's timely request for review, making the ALJ's decision the final decision of the Commissioner. R. 1-5.  Plaintiff exhausted her administrative remedies and this lawsuit timely followed.

## STANDARD OF REVIEW

 To qualify for Social Security benefits, a claimant must show that she is disabled.  *Ellison v. Barnhart,* 355 F.3d 1272, 1276 (11th Cir. 2003); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); 20 C.F.R. §§ 404.1512(a), 416.912(a).  The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A "physical or mental impairment" is one that "results from anatomical, physiological, or

---

[1] Plaintiff filed two prior applications for SSI benefits. On June 24, 2014, she filed an SSI application that was denied by an Administrative Law Judge in a final decision dated April 26, 2017. R. 53-71. Plaintiff filed another application for SSI benefits on June 27, 2019, that was denied at the initial level. R. 72-84, 102-03.  In lieu of appealing this decision, Plaintiff opted to file a third application, which is the subject of this appeal.

psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

A disability benefits claim follows a multi-layered process before it can be reviewed in federal court. A claimant first applies to a state agency for disability determinations, 42 U.S.C. § 421(a), after which the claimant is entitled to an evidentiary hearing before an ALJ. *Heckler v. Day*, 467 U.S. 104, 106–07 (1984). An ALJ must perform a "five-step sequential evaluation" to determine if a claimant is disabled. *See* 20 C.F.R. § 404.1520(a)(4). This five-step process determines if a claimant (1) is currently employed; (2) has a severe impairment; (3) has an impairment or combination of impairments that meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings"); (4) can perform past relevant work based on a residual functional capacity ("RFC") assessment; and (5) retains the ability to perform any work in the national economy. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011); *Phillips v. Barnhart*, 357 F.3d 1232, 1237 (11th Cir. 2004). The claimant has the burden of proof through step four and then the burden shifts to the Commissioner at step five. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018); *Hines–Sharp v. Comm'r of Soc. Sec.*, 511 Fed. Appx. 913, 915 n.2 (11th Cir. 2013). If an individual is found disabled or not disabled at any step, further inquiry is unnecessary. 20 C.F.R. § 416.920(a)(4).

A claimant may appeal an ALJ's decision to an Appeals Council that must review the case and determine if the ALJ's "action, findings, or conclusion is contrary to the weight of the evidence currently of record." *Heckler*, 467 U.S. at 107, n.5; 20 C.F.R. § 404.970(a). After completing the foregoing administrative process, a claimant may seek review in federal court. 42 U.S.C. § 405(g); *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260-61 (11th Cir. 2007).

The scope of judicial review is limited to determining if (1) substantial evidence supports the Commissioner's findings, and (2) the correct legal standards were applied. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). To make this determination, a reviewing court must "scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citing *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). It is "more than a mere scintilla, but less than a preponderance." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (citation omitted). The Supreme Court recently explained that "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Biestek*, 139 S. Ct. at 1154.

In testing for substantial evidence, a court may not "reweigh the evidence" or "decide the facts anew." *Winschel*, 631 F.3d at 1178. Instead, so long as the ALJ's findings are supported by substantial evidence, they are conclusive, and the court must defer to the ALJ's decision even if the evidence preponderates against it. *Crawford*, 363 F.3d at 1158-59 (citation omitted); *see also Biestek,* 139 S. Ct. at 1157 (2019) (the governing standard of review defers to the presiding ALJ, "who has seen the hearing up close"). However, the court will not "merely rubber-stamp a decision ... [and] must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1257 (11th Cir. 2019); *see also Simon v. Comm'r of Soc. Sec.*, 7 F.4th 1094, 1104 (11th Cir. 2021) ("Within this narrowly limited role, however, the federal courts 'do not act as automatons' … '[w]e retain an important duty to 'scrutinize the record as a whole' and determine whether the agency's

4

decision was reasonable") (citation omitted).   Remand is appropriate for further factual development "where the record reveals evidentiary gaps which result in unfairness or clear prejudice." *Washington*, 906 F.3d at 1358 (11th Cir. 2018) (citation omitted).

A reviewing court must also review the ALJ's decision to determine if the correct legal standards were applied. *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997).  If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide sufficient reasoning for determining that the proper legal analysis has been conducted, then the ALJ's decision must be reversed. *See Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## THE ALJ'S DECISION

The ALJ in this case proceeded through the multi-step sequential analysis as follows.  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since October 20, 2020, the application date. R. 12.  At step two, the ALJ found that Plaintiff had the following severe impairments: disorders of the skeletal spine; ischemic heart disease; other unspecified arthropathy; obesity and migraines. *Id.* (citing 20 C.F.R. § 416.920(c)).[2]  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an agency-listed impairment.  R. 14.

As a predicate to step four, the ALJ found that while several of Plaintiff's impairments qualified as severe, Plaintiff retained the residual functional capacity ("RFC") to perform light work with restrictions. *Id.*  Specifically, the ALJ found:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b). The claimant can lift and/or carry 20 pounds occasionally; lift and/or carry 10 pounds frequently; stand and/or walk 6 hours in an 8-hour workday; sit 6 hours in an 8-hour workday. The claimant may never climb ladders/ropes/scaffolds, occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl. The claimant must avoid concentrated exposure to hazards. The claimant can tolerate no more than moderate levels

---

[2]  The ALJ noted that Plaintiff also had anxiety and depression; however, the ALJ found these conditions to be non-severe.  R. 12.

of noise as defined in Appendix D of the Selected Characteristics of Occupations; should avoid work outdoors in bright sunshine; no work with bright or flickering lights such as would be experienced in welding or cutting metals.

*Id.* At step four, based in part on the VE's testimony, the ALJ found that Plaintiff could not perform her past relevant work. R. 20. At step five, considering Plaintiff's age, education, work experience, RFC, and the VE's testimony, the ALJ found Plaintiff capable of successfully adjusting to other available work in the national economy. R. 21. Specifically, the ALJ found Plaintiff capable of working at a light exertion and skill level in the representative occupations of office helper (light, unskilled, DOT 239.567.010), ticket taker (light, unskilled, DOT 344.667.010) and routing clerk (light, unskilled, DOT 222.587.038). *Id.* Therefore, the ALJ concluded that Plaintiff had not been disabled within the meaning of the Social Security Act since October 20, 2020, the date her application was filed. R. 21-22.

## DISCUSSION

Plaintiff's appeal raises two issues. First, Plaintiff argues that the ALJ failed to properly consider her migraine headaches at steps three and four of the five-step disability evaluation process. DE 18 at 9-20. Second, Plaintiff asserts the ALJ failed to properly develop the record by not obtaining an MRI and relying on "outdated" medical source opinions connected to a prior SSI application instead of ordering a new consultative examination or obtaining testimony from a medical expert. *Id.* at 12-20. Upon review, I find no merit in these arguments and recommend that the ALJ's decision be affirmed.

## I.   The ALJ properly evaluated Plaintiff's migraine impairments at Steps Three and Four.

Plaintiff argues the ALJ failed to consider her migraine headaches appropriately under steps three and four of the sequential process. Specifically, Plaintiff contends the ALJ erred in (1) failing to adequately explain his step three finding that Plaintiff's migraine headaches do not equal

or meet the criteria of any of the neurological Listings at 11.00ff; (2) finding that Plaintiff's

migraine headaches do not meet Listing 11.02; and (3) formulating the RFC, which does not

account for the time off task and absenteeism Plaintiff says she will experience as a result of her

migraines.  DE 18 at 11-20.   The Commissioner counters that the ALJ properly found Plaintiff's

migraine condition did not meet or equal Listing 11.02 and adequately accounted for Plaintiff's

migraines in the RFC.  Below, I will address each argument in turn.

**A.  Step Three**

**1.      The ALJ Did Not Err in his Step Three Analysis.**

At step three, the ALJ found as follows:

> **The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).**
>
>> The claimant's impairments do not equal or meet the criteria of 1.15, disorders of the skeletal spine resulting in compromise of a nerve root, or 1.16, lumbar spinal stenosis resulting in compromise of the cauda equina. Several records indicate that the claimant has normal and unassisted gait, and there is no indication that she is has significant limitation in fine or gross manipulation. The claimant's impairments also fail to equal or meet the criteria of 4.04, ischemic heart disease, because testing does not demonstrate the required severity. The claimant's migraines do not equal or meet the criteria of any of the neurological listings at 11.00ff.

R. 14.  Plaintiff argues that the ALJ's failure to adequately explain or support his conclusion that

Plaintiff's migraines do not equal or meet any of the neurological listings constitutes harmful error.

DE 18 at 13.

"The Listing of Impairments describes, for each of the major body systems, impairments

which are considered severe enough to prevent a person from doing any gainful activity." *Wilson*

*v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002) (citing 20 C.F.R. § 404.1525(a)).  At the third

step of the five-step disability evaluation process, the ALJ must determine whether a claimant's impairment meets or medically equals the severity of one of the Listings. 20 C.F.R. § 416.920(a)(4)(iii). A claimant who meets or otherwise establishes equivalence to a Listing is entitled to benefits. *Edwards v. Heckler*, 736 F.2d 625, 626 (11th Cir. 1984). A claimant who fails to meet a Listing moves on to step four of the sequential disability analysis.

The claimant bears the burden of showing that her impairment meets a Listing. *See Harris v. Comm'r of Soc. Sec.*, 330 Fed. Appx. 813, 815 (11th Cir. May 22, 2000). A claimant meets a Listing if she has a diagnosis included in the Listings and provides medical reports documenting that her conditions meet the specific criteria in the Listings. *Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002) (per curiam). Because a showing that a claimant's condition meets a listed impairment results in the conclusive determination that she is disabled and therefore entitled to benefits, the evidentiary standards are especially strict. *See* 20 C.F.R. § 416.925(c); *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990).

While several circuits require an ALJ to explain why a claimant meets or does not meet the appropriate Listing,[3] the Eleventh Circuit has a more relaxed rule. In the Eleventh Circuit, the ALJ need not state explicitly why the claimant does not meet the Listing. Instead, "[t]here may be an implied finding that a claimant does not meet a listing." *Hutchison v. Bowen*, 787 F.2d 1461, 1463 (11th Cir. 1986); *accord Kalishek v. Comm'r of Soc. Sec.*, 470 Fed. Appx. 868, 870 (11th Cir. May 30, 2012) (An "ALJ's finding as to whether a claimant meets a listed impairment may be implied from the record."); *cf. Karlix v. Barnhart*, 457 F.3d 742, 746 (8th Cir. 2006) ("The fact that the ALJ did not elaborate on this conclusion [that plaintiff did not meet a Listing] does not

---

[3] *See, e.g., Cook v. Heckler*, 783 F.2d 1168 (4th Cir. 1986); *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000); *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004); *Murphy v. Comm'r Soc. Sec.*, 423 Fed. Appx. 703, 704 (9th Cir. 2011); *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996); *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 416 (6th Cir. 2011).

require reversal, because the record supports her overall conclusion.").  Where, as here, the ALJ states that a plaintiff does not have an impairment or combination of impairments that meets or medically equals a Listing, that statement constitutes evidence that the ALJ considered the combined effects of a plaintiff's impairments.  *Wilson*, 284 F.3d at 1224.

Moreover, the record reflects that the ALJ thoroughly considered Plaintiff's claims about her migraine headaches and the medical evidence of record, albeit not in the step three section of the decision.  The decision specifically notes that Plaintiff has a history of headaches and was diagnosed with migraines with aura by Dr. Thomas Digeronimo in 2018.  R. 15-16.  As part of his analysis, the ALJ accurately reviewed and discussed three years' worth of monthly treatment records from Dr. Digeronimo and his staff relating to Plaintiff's migraines.  R. 16-19 (citing R. 521-675).  The ALJ also accurately summarized Plaintiff's emergency room records, including a migraine-related emergency room visit in June 2021.  R. 18, (citing R. 649-71).  The ALJ emphasized that although Plaintiff presented to the hospital due to a migraine with vomiting, she had no motor deficits or sensory deficits, and had a normal gait with equal reflexes.  R. 18.  Although the ALJ did not explain his step three finding, he considered the medical evidence relating to Plaintiff's migraines elsewhere in the decision and determined that Plaintiff's migraine impairment was not of listing-level severity.  Under *Wilson* and *Hutchinson, supra,* the ALJ did not err by failing to further explain his step three conclusion that Plaintiff's migraines do not meet or medically equal a Listing.  *See Wilson*, 284 F.3d at 1224; *see also Majkut v. Astrue*, 2009 WL 860623, at *12 n. 9 (M.D. Fla. Mar. 30, 2009) ("[T]here is no requirement that the ALJ provide a step-by-step analysis of his Listing determination.").

**2.** **Plaintiff's Migraine Headaches do not Meet or Medically Equal a Listing.**

While there is no specific Listing for migraine headaches, the parties agree that Listing 11.02 (epilepsy) is the most analogous listed impairment.  Social Security Ruling (SSR) 19-4p provides:

> Epilepsy (listing 11.02) is the most closely analogous listed impairment for an MDI [medically determinable impairment] of a primary headache disorder.  While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we may find that his or her MDI(s) medically equals the listing.

*Titles II & XVI: Evaluating Cases Involving Primary Headache Disorders*, SSR 19-4P, 2019 WL 4169635, *7 (S.S.A. Aug. 26, 2019).  Dyscognitive seizures are characterized by "alteration of consciousness without convulsions or loss of muscle control."  § 11.00H1ab.  To meet Listing 11.02, dyscognitive seizures must occur at the following level of severity:

> B.  Dyscognitive seizures (see 11.00H1b), occurring at least once a week for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); or
>
> D.  Dyscognitive seizures (see 11.00H1b), occurring at least once every 2 weeks for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); and a marked limitation in one of the following:
>
> > 1.  Physical functioning (see 11.00G3a); or
> >
> > 2.  Understanding, remembering, or applying information (see 11.00G3b(i)); or
> >
> > 3.  Interacting with others (see 11.00G3b(ii)); or
> >
> > 4.  Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
> >
> > 5.  Adapting or managing oneself (see 11.00G3b(iv)).20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.02.

10

"As courts have noted, it is at first blush hard to see how an epilepsy Listing requiring dyscognitive seizures, which involve an alteration of consciousness, is the most analogous provision for determining medical equivalence in a migraine headache case." *Turner v. Saul*, 2021 WL 2134955, *15 (E.D. Wis. May 25, 2021) (citing cases). At least two courts in this circuit have found that, for a plaintiff suffering from migraines to establish medical equivalence to Listing 11.02, she "must demonstrate, at a minimum, an alteration of consciousness." *Musgrave v. Kijakazi*, 2023 WL 2838127, at *8 (S.D. Fla. Feb. 6, 2023), *report and recommendation adopted*, 2023 WL 2707376 (S.D. Fla. Mar. 30, 2023); *George v. Berryhill*, 2017 WL 2469968, at *6–7 (S.D. Ga. May 19, 2017), *report and recommendation adopted*, 2017 WL 2468801 (S.D. Ga. June 7, 2017). I disagree with this analysis. Under this approach, it is hard to see how migraine headaches themselves could ever meet or equal a listed impairment. *See Jeffrey N. v. Comm'r of Soc. Sec.*, 2021 WL 4497144, at *7 (D. Idaho Sept. 30, 2021) (requiring alteration of consciousness is a misguided approach because "migraine headaches *themselves* would never meet or equal a listed impairment.") (emphasis in original). A claimant who has migraines should not be required to show an alteration of consciousness to medically equal Listing 11.02 since the claimant has migraines, not seizures. Rather, the claimant must show symptoms *equivalent in severity and duration* to those attending listing-level dyscognitive seizures. *See* 20 C.F.R. § 404.1526(a) (equivalency exists where a claimant's impairment "is at least equal in severity and duration to the criteria of any listed impairment.").

The Social Security Administration has provided guidance on how to evaluate whether a primary headache disorder is equal in severity and duration to the Epilepsy Listing.

> To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an AMS [acceptable medical source] of a typical headache event, including all associated phenomena (for example,

premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations). …

To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02D, we consider the same factors we consider for 11.02B and we also consider whether the overall effects of the primary headache disorder on functioning results in marked limitation in: Physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself.

*See* SSR 19-4P, 2019 WL 4169635 at \*7.

Consistent with this guidance, courts have noted that a person cannot be said to medically equal Listing 11.02 merely because she suffers headaches at least once a week for three months despite treatment; that only speaks to frequency. The claimant's headaches must also produce symptoms equivalent in severity to symptoms of dyscognitive seizures as described in the regulations. *Jozefyk v. Saul*, 2020 WL 5876063, at \*3 (E.D. Wis. Oct. 2, 2020) ("Only if a person suffers headaches at that frequency *and* those headaches produce symptoms that are medically equivalent to that which attend dyscognitive seizures will a finding of medical equivalence be appropriate"); *see also Jandt v. Saul*, 2021 WL 467200, at \*7–8 (W.D. Ky. Feb. 9, 2021) (collecting cases discussing the duration and severity of the headaches required to equal the Listing).

Plaintiff argues that she meets a Listing because her headaches "occur in a frequency equivalent to that described under Medical Listing 11.02 for *Epilepsy*." DE 18 at 13. In support,

she cites a string of treatment notes documenting that she reported having between three to nine headaches some months. DE 18 at 13. This is insufficient, however, because frequency alone is not enough to medically equal Listing 11.02. Plaintiff does not point to any detailed description in the record from an accepted medical source of a typical headache event including all associated phenomena. In fact, on at least four occasions in the record, Plaintiff is in the presence of a provider during a migraine headache episode and the provider describes Plaintiff as well-appearing, in no acute distress, gross and fine motor coordination intact, and normal gait and stance. R 323-24, 613-14, 633, 650. On two instances, the provider also notes that, despite having a migraine at the time, Plaintiff had normal olfactory nerves with ability to differentiate simple smells; normal pupils equal, round, reactive to light and accommodation; normal extra ocular eye movements without facial drooping; normal side to side facial alignment and expression; normal hearing to whisper at 5 ft; normal palate movement; normal swallowing; and sensation normal to light touch, temperature, vibration and position. R. 613-14, 633. In June 2021, Plaintiff went to the emergency room for a migraine headache. She reported pain and vomiting, but denied sensory, visual, or motor aura, confusion, difficulty speaking, photophobia, numbness, seizure, syncope, vertigo, visual disturbance, or weakness. R. 650. While some of the record entries Plaintiff cites discuss headache severity and duration, plaintiff develops no argument that these episodes were typically equivalent in severity to dyscognitive seizures as referenced in Listing 11.02(B) and (D). *See Melissa M. v. Berryhill*, 2019 WL 2567317, at *10 (S.D. Ill. June 21, 2019)("No medical evidence in the record suggest plaintiff ever had a migraine during which she suffered an alteration of consciousness or that otherwise approached a dyscognitive seizure.").

I considered all of Plaintiff's assertions in her briefing concerning her migraine headaches. It bears repeating here that Plaintiff bears the burden of establishing that her impairment of

migraine headaches meets or medically equals Listing 11.02.  *See Bailey*, 782 F. App'x at 40.

Plaintiff failed to meet her burden.  She has not demonstrated that her migraine headaches produce

symptoms equivalent in severity to symptoms of dyscognitive seizures.  Plaintiff's argument on

this basis should therefore be denied.

### B.      Step Four

Next Plaintiff argues that the RFC is not supported by substantial evidence and the ALJ

failed to properly evaluate her subjective complaints about her migraine headaches in determining

the RFC.  Upon review, I find that the ALJ's RFC determination that Plaintiff can perform light

work with additional restrictions is substantially supported.

A centerpiece of the ALJ's decision is the RFC finding.  The RFC, defined as the most the

claimant can still do despite his or her limitations, is based on an evaluation of all the relevant

evidence in the record.  *See* 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1) and (a)(3); SSR 96-8p, 1996

WL 374184 (July 2, 1996).  The task of determining a claimant's RFC and ability to work rests

squarely with the ALJ, not a medical source.  *See Moore v. Soc. Sec. Admin., Comm'r*, 649 F.

App'x 941, 945 (11th Cir. 2016) ("[T]he task of determining a claimant's [RFC] and ability to

work rests with the [ALJ], not a doctor.").

Moreover, to establish disability based upon pain or other subjective symptoms, Plaintiff

must present: (1) evidence of an underlying medical condition and (2) either (a) "objective medical

evidence that confirms the severity of the alleged pain arising from that condition," or (b) "that the

objectively determined medical condition is of such a severity that it can reasonably be expected

to give rise to the alleged pain."  *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  "In

evaluating a claimant's testimony, the ALJ should consider: (1) the claimant's daily activities; (2)

the location, duration, frequency, and intensity of claimant's symptoms; (3) [p]recipitating and

aggravating factors; (4) the effectiveness and side effects of any medications; and (5) treatment or other measures taken by the claimant to alleviate symptoms." *Underwood v. Doc. Sec. Admin., Comm'r,* 750 F. App'x 944, 947 (11th Cir. 2018) (citations and quotations omitted).

Here, the ALJ considered Plaintiff's migraine complaints, noting Plaintiff's estimated "five migraines a month, each lasting one to two days." R. 15. After reviewing and summarizing the medical record, however, the ALJ found that, "when the claimant took her medication, she reported having migraines only twice a month." R. 19. Thus, the ALJ concluded the medical record was not entirely consistent with Plaintiff's allegations. *Id.*

Plaintiff takes issue with several aspects of the ALJ's RFC determination as it relates to Plaintiff's migraines. First, Plaintiff disputes the ALJ's finding that her headache frequency was two migraines per month when she was compliant with her medicines. DE 18 at 16-17. Second, Plaintiff claims the ALJ erroneously implied that Plaintiff was not compliant with her migraine medications. *Id.* at 15-16. Third, Plaintiff disagrees with the ALJ's characterization of her migraine treatment as "conservative." *Id*. at 17-18. Fourth, Plaintiff asserts that the ALJ improperly considered Plaintiff's activities of daily living. *Id*. at 18-20.

Regarding the frequency of Plaintiff's headaches, I have thoroughly reviewed the medical record pertaining to Plaintiff's migraine impairment. Plaintiff resumed treatment with Dr. Digeronimo's office for migraine headaches, back pain, and knee pain on November 12, 2018, after a three year period of not treating there. Dr. Digeronimo prescribed 50 mg of topiramate twice a day for Plaintiff's migraines, as well as various other medications for her knee and back pain. R. 302-03. At a follow up visit on December 13, 2018, Plaintiff reported that the medication made a difference, but she was still having three headaches a week. R. 306. Her migraine medication was increased to 100 mg of topiramate twice a day. R. 307-08. Plaintiff returned a

week later and indicated that, with the topiramate increase, her headaches were down to once a week.  R. 310.   By December 31, 2018, Plaintiff reported that her migraine frequency had decreased to around two migraine headaches per month.  R. 314.

For most of 2019, Plaintiff reported two migraine headaches or less per month.  On January 29, 2019, she reported having two "low severity" migraine headaches per month.  R. 317.  At her February 2019 visit, she reported two low severity migraine headaches per month since taking the medication and said she no longer had nausea because her migraines had improved.  R. 320.  When Plaintiff arrived for her March visit, she was having a bilateral headache with a 6/10 pain level. R. 323.  Despite her headache, the provider noted on exam that Plaintiff was well-appearing, in no acute distress, gross and fine motor coordination intact, and normal gait and stance.  R 323-24. The provider increased her topiramate to 200 mg in the morning and 100 mg in the afternoon for two weeks, and then 200 mg twice a day.  R. 324-25.  The provider also gave her an injection of Toradol with lidocaine.  R. 323-24.

The following month, April 2019, Plaintiff stated that she had not had any headaches since her last office visit.  R. 327.  In May 2019, she reported only one headache since her last visit, but had a headache at the time of the visit.  R. 331-333.  She returned for her next visit on June 13, 2019.  For the first time in six months, she reported having four migraines over the past month, one which lasted 2.5 days, possibly triggered by rainy weather.  R. 335.  No changes were made to her migraine medication.  R. 336. On July 15, 2019, she reported "her headaches [were] under relatively good control."  R. 413.  On August 15, 2019, she reported that "her headaches ha[ve] greatly improved to 2 times per month."  R. 417.  On September 16, 2019, she said her migraine frequency was about twice monthly.  R. 550.  In October 2019, Plaintiff reported a spike in

headaches to 10 days per month, "though the severity and duration [was] a bit less."[4]  The provider added 2.5 mg of frovatriptan to be taken at the onset of a headache and repeated in two hours if needed.  R. 554.  In November 2019, Plaintiff reported significant improvement, noting that her migraine frequency last month was 10 days per month, and now it is down to 3 days per month. R. 556.

From December 2019 to March 2020, however, Plaintiff reported an increase of 6 to 7 migraine days per month, so her provider switched her to sumatriptan instead of frovatriptan.  R. 566-567.  At her follow up visit in April 2020, Plaintiff reported that the sumatriptan helped relieved the headaches, which had reduced to three per month.  R. 569.  In May 2020, she reported three migraines over the last month, only one of which was severe.  R. 572.  At her June visit, she reported three migraines.  R. 575.  In July and August 2020, she reported two migraines over the past month, and on September 1, 2020 it does not appear that she reported any migraines.  R. 578-587.  On September 29, 2020, she reported that her migraines had increased some because she could not afford her Topamax that month, but by the following month (which was the month she filed her third SSI application currently under review) her migraines were stable.  R. 590, 593.  At an office visit on November 24, 2020, she reported two headaches over the last month.  R. 597.

Plaintiff's January 2021 treatment note reported "about 9 headache days over the last month," but her February 2021 treatment note said she only had two headaches in January which increased to five in February.  R. 603, 606.  In March 2021, Plaintiff reported two headaches lasting three days that were not relieved by the sumatriptan or frovatriptan, so her provider gave her samples of Nurtec, Ubrelvy and Reyvow to see if they were beneficial.  R. 609-10.  In April 2021, Plaintiff reported that the Nurtec worked best for her and she had four migraines that month.  R.

---

[4] Plaintiff alleges a disability onset date of October 15, 2019.

614.  In May 2021, she reported three migraines over the last month and that the medicines were "working well to modify the pain, paresthesia, and migraines."  R. 617.  The provider added Tosymra nasal spray to be administered at the onset of a headache.  R. 618.  In June 2021, Plaintiff reported five migraines over the last month because she ran out of her medications due to car issues and was unable to obtain Tosymra due to cost and no insurance.  R. 641.[5]  In July 2021, Plaintiff reported three migraines over the last month.  R. 637.  In August 2021, Plaintiff reported three migraines over the last month and had a headache on the date of her doctor visit.[6]  She said her son was being offered 10 years and she was feeling very stressed.  R. 633.  In September 2021, she reported five migraines due to her son giving her more stress but indicated that her pain has been under decent control with the medications.  R. 629.   In October 2021, she reported four migraines and says she has been "more stressed related to the loss of her friends and family members recently."  R. 625.

Having reviewed the record, I find the ALJ's determination that Plaintiff's headache frequency was two migraines per month when she was compliant with her medicines to be fairly supported by the evidence.  Subject to periodic adjustments of her prescribed medications, Plaintiff usually reported two or three migraines per month and her medications appeared to work well. Contrary to Plaintiff's testimony before the ALJ, she rarely reported five or more headaches to her providers, except when she could not obtain her medications, or her medications needed to be adjusted.  When she had difficulty obtaining her medications, she experienced more frequent

[5] On June 9, 2021, Plaintiff went to the emergency room for a "moderate" migraine headache.  R. 650.  She reported pain and vomiting, but denied sensory, visual, or motor aura, confusion, difficulty speaking, photophobia, syncope, vertigo, visual disturbance, or weakness.  R. 650.  On exam, the provider noted that she was in mild/moderate distress, oriented x 3, and had no speech, motor, sensory, or gait deficits.  R. 651.

[6] Although she had a headache at the time of the visit, her gross and fine motor coordination were intact and she displayed normal gait and stance and normal neurological findings.  R. 633.

migraines.  Thus, substantial evidence overall supports the ALJ's finding that the medical record is not entirely consistent with Plaintiff's subjective claims.

I also find no error in the ALJ's mention of Plaintiff's medication compliance.  Plaintiff contends that the ALJ erroneously focused on Plaintiff's non-compliance, but that contention is incorrect.  The ALJ merely noted that Plaintiff's "course of treatment has been conservative, and she reported that her medications, even despite some noncompliance, improved her symptoms." R. 19.This finding is well supported by the record.

Nor is the ALJ's description of Plaintiff's migraine treatment as "conservative" an error warranting remand.  *Id*. at 17-18.  Indeed, the record supports this characterization.  Plaintiff often described her migraines as "low severity" or said she was managing well with her medications.  R. 310, 317, 320.  Plaintiff never demonstrated functional limitations while experiencing a migraine. R. 522, 525-26, 632-33, 654.  Even when she went to the emergency room with a migraine, Plaintiff described it as "moderate," displayed no acute symptoms, and was released the same day. R. 654.  And, although Plaintiff was prescribed narcotics, this medication was prescribed for her other physical impairments, not her migraines.  *See*, *e.g.*, R. 626 (prescribing oxycodone for lumbar spine pain).

Lastly, the ALJ did not err in considering Plaintiff's daily living activities.  *Id*. at 18-20. Under the regulations, the ALJ must consider the extent to which the claimant's self-reported symptoms can "reasonably be accepted as consistent with the objective medical evidence and other evidence," which includes daily activities, among other factors.  20 C.F.R. § 404.1529(a), (c)(3). Here, the ALJ did not consider Plaintiff's daily living activities solely in reference to her migraine symptoms; rather, he evaluated her activities in light of all of her impairments, which included back/lumbar spine pain, osteoarthrosis, and obesity.  Moreover, the ALJ did not discount Plaintiff's

subjective claims about her migraines based solely or even primarily on her activities of daily living.  The ALJ evaluated the entire record – which included Plaintiff's medical records, daily activities, and subjective complaints – and concluded that although Plaintiff did in fact have several severe impairments, including migraine headaches, she was not *completely* disabled.  To account for Plaintiff's migraines, the ALJ appropriately included limitations in the RFC that Plaintiff must avoid concentrated exposure to hazards; can tolerate no more than moderate levels of noise; should avoid work outdoors in bright sunshine; and can perform no work with bright or flickering lights such as would be experienced in welding or cutting metals.  R. 14, 18, 20 (ALJ concluding that "light work with environmental limitations provides adequate accommodation for the claimant's obesity and migraines").  Based on my own independent review of the totality of evidence, I find no error in the ALJ's analysis.

Overall, a holistic review of the record supports the ALJ's findings that Plaintiff's physical impairments caused work-related limitations, but that she retained the ability to perform a range of light work with appropriate restrictions.  The ALJ articulated how he evaluated the applicable factors in light of the record evidence to arrive at his ultimate finding that Plaintiff was not disabled as that term is defined in this context.  At this level of judicial review, I may not rewrite evidence or substitute my judgment for that of the ALJ.  My review is limited to determining if the final decision is supported by substantial evidence and based on proper legal standards.  In this case, I find that it is.  Plaintiff offers no justifiable reason to depart from the Commissioner's final decision, which is substantially supported and legally sound.

## II.    The ALJ Properly Developed the Record.

Plaintiff contends that remand is warranted because the ALJ failed to properly develop the record by (1) failing to order an MRI; (2) relying on "outdated" consulting opinions from 2019

obtained in connection with a prior SSI application; and (3) failing to obtain a medical expert to testify about whether Plaintiff's migraines meet a Listing.  DE 18 at 20-22.

The ALJ has a basic duty to develop a full and fair record.  *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003).  The burden of proving disability, however, rests primarily with the claimant.  *See id.*; 20 C.F.R. § 416.912(c) ("You must provide medical evidence showing that you have an impairment(s) and how severe it is during the time you say that you are disabled.").  In addition, "there must be a showing of prejudice before it is found that [Plaintiff's] right to due process has been violated to such a degree that the case must be remanded to the [Commissioner] for further development of the record."  *Graham*, 129 F.3d at 1423.  Significantly, "[t]he court should be guided by whether the record reveals evidentiary gaps which result in unfairness or 'clear prejudice.'"  *Id*.

First, the ALJ's failure to order an MRI in this case does not warrant a remand.  A failure to develop the record does not warrant a remand unless the plaintiff demonstrates evidentiary gaps in the record which result in "unfairness or clear prejudice."  *Graham v. Apfel*, 129 F.3d 1420, 1423 (11th Cir. 1997); *see also Edwards v. Sullivan*, 937 F.2d 580, 586 (11th Cir. 1991); *Robinson v. Astrue*, 235 Fed. Appx. 725, 727 (11th Cir. 2007); *Henderson v. Comm'r of Soc. Security*, 353 Fed. Appx. 303, 305 (11th Cir. 2009).  Specifically, the plaintiff must identify "what facts could have been submitted … that would have changed the outcome."  *Edwards v. Sullivan*, *supra*, 937 F.2d at 586.  Here, plaintiff fails to show prejudice because she makes no attempt to explain how an MRI would have changed the ALJ's disability determination.  *See, e.g., Henderson*, 353 Fed. Appx. at 305  (plaintiff failed to show prejudice because she "does not explain how the absence of … [that evidence] precluded the ALJ from making an informed disability determination.  Nor does she explain how such an assessment would have affected the ALJ's overall disability

determination.").   Nothing before me indicates that the ALJ needed an MRI to assess Plaintiff's RFC or evaluate her claim.   On the contrary, the record is replete with evidence supporting the ALJ's determination, including years of treatment notes and examinations from Plaintiff's providers and a consultative exam.   Neither the consultative examiner (Dr. Pascal Bordy) nor the state agency reviewers recommended an MRI.   Plaintiff's counsel also did not request an MRI. The absence of an MRI, by itself, does not demonstrate reversible error.  *See, e.g., Bailey v. Astrue*, 739 F. Supp.2d 1365, 1377-78 (N.D. Ga. 2010) (finding there was sufficient evidence to support a disability determination without an MRI where the record was unambiguous on presence of pain and there was no indication that doctors who provided opinions could not do so without an MRI).

Plaintiff also has not shown an evidentiary gap resulting in unfairness or clear prejudice from the ALJ's failure to order an additional consultative examination.   The ALJ relied upon the consultative examination conducted by Dr. Bordy on October 8, 2019.   R. 18 (citing R. 425-33). Although Plaintiff contends that Dr. Bordy's examination was "outdated," it preceded the relevant twelve-month adjudication period by a mere 12 days.   Plaintiff also complains that the state agency opinion relied upon by the ALJ was similarly "outdated," however this opinion predated the adjudication period by only a single day.   I disagree with Plaintiff's position.

Under the social security regulations, the ALJ may order additional consultative examinations if the medical evidence submitted by the claimant does not provide enough information about an impairment to determine whether the claimant is disabled.   20 C.F.R. § 416.917.   Under Eleventh Circuit precedent, an ALJ is not *required* to order additional examinations or consult with a medical expert, however, if the evidence in the record is sufficient for the ALJ to make an informed decision.  *Salazar v. Comm'r of Soc. Sec.*, 372 F. App'x 64, 67 (11th Cir. 2010); *Fries v. Comm'r of Soc. Sec. Admin.*, 196 F. App'x 827, 830 (11th Cir. 2006).

Nothing before the court suggests that the ALJ needed an additional consultative examination or expert testimony to assess Plaintiff's RFC. Indeed, a consultative examination had already been conducted by Dr. Bordy. Although Dr. Bordy did not have the benefit of reviewing Plaintiff's more recent medical records, the ALJ had these records and considered them in determining Plaintiff's RFC. For example, as discussed above, the ALJ fairly considered and comprehensively summarized Dr. Digeronimo's treatment notes and relevant hospital records as being consistent with a finding that Plaintiff could perform light work with certain additional restrictions to coincide with "the musculoskeletal nature of the claimant's impairments" and "to accommodate for the claimant's migraines." R. 18. Having reviewed the entire record, I conclude that that the medical evidence available to the ALJ was sufficient for him to make an informed determination of Plaintiff's RFC and Plaintiff has failed to point to any medical records demonstrating significant deterioration in her condition that would render Dr. Bordy's examination obsolete or an otherwise invalid indicator of Plaintiff's medical condition.

This is not a situation of an ALJ's sole reliance on vague opinions or opinions that far predate the relevant time period. Moreover, Plaintiff cites no authority indicating that the ALJ was not permitted to rely on opinions rendered prior to the relevant period if the record shows that the opinions are consistent with Plaintiff's current level of function. *See Trimble v. Comm'r, Soc. Sec. Admin*, 2023 WL 8768903, *6 (11th Cir. Dec. 19, 2023) (*citing Washington v. Soc. Sec. Admin., Comm'r*, 806 F.3d 1317, 1322 (11th Cir. 2015) (recognizing that medical source opinions outside of the relevant time period may be informative of the condition of the individual during the relevant time period). Additionally, as correctly pointed out by the Commissioner, Plaintiff was represented by counsel at the administrative hearing before the ALJ and that counsel did not ask that Plaintiff be sent again for a consultative examination, nor did counsel request medical expert

testimony.  Presumably, counsel was aware of the evidence in the record and was satisfied with it. Thus, considering all these circumstances, the ALJ did not err by failing to order an additional consultive examination or obtaining medical expert testimony.

Lastly, Plaintiff has not shown an evidentiary gap or any prejudice based upon the ALJ's failure to obtain expert testimony on whether Plaintiff's migraines met a Listing.  As explained in depth above, substantial evidence in the record supported the ALJ's conclusion that Plaintiff's migraine headaches did not meet or equal a Listing.  The ALJ pointed to particular pieces of medical evidence in the record and clearly articulated how that evidence led to a finding that Plaintiff retained the capacity to perform a reduced range of light work.

## **CONCLUSION**

The operative inquiry at this level of judicial review is whether the ALJ properly evaluated Plaintiff's medical condition as a whole, whether the ALJ's determination is supported by substantial evidence, and whether the ALJ adequately developed the record.  In this case, following my careful review of the record, I am satisfied that the ALJ fully and fairly evaluated Plaintiff's condition as a whole and the ALJ's determinations are properly substantiated.  The ALJ conscientiously analyzed relevant medical opinions and other evidence concerning Plaintiff's impairments, abilities, and RFC, and the ALJ supported his findings with specific reasons and references to the available record evidence.

Accordingly, I respectfully **RECOMMEND** that Plaintiff's Motion for Summary Judgment, DE 18, be **DENIED**; that Defendant's Motion for Summary Judgment, DE 19, be **GRANTED**; and that Defendant's final administrative decision be **AFFIRMED**.

## <u>NOTICE OF RIGHT TO OBJECT</u>

The parties shall have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with U.S. District Judge Donald M. Middlebrooks.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and Recommendation and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report and Recommendation.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).  **Conversely, if a party does not intend to object to this Report and Recommendation, then that party shall file a Notice of Non-Objection within five (5) days of the date of this Report and Recommendation.**

**DONE AND RECOMMENDED** in Chambers at Fort Pierce, Florida, this 8th day of February, 2024.

SHANIEK MILLS MAYNARD
U.S. MAGISTRATE JUDGE